Lisa White Hardwick, Judge
Bryn Myers appeals from a judgment holding that her deceased brother's widow, as the personal representative of his estate and his sole heir, has standing as a beneficiary under a family trust. She contends the circuit court misapplied the law because *105 her brother died before his beneficiary interest in the trust vested. For reasons explained herein, we affirm.
FACTUAL AND PROCEDURAL HISTORY
Byron and Rosilea Myers were husband and wife. They had three children: Nancy Myers, James Myers, and Bryn Myers.[1] Byron and Rosilea each executed a Revocable Living Trust Agreement.[2] The trust provided that, if no spouse survived, trust assets were to be held in a single trust known as the "family trust." If one spouse survived, a QTIP trust was to be established to take advantage of the unified credit against the federal estate and gift tax with the remainder then going to a family (or marital deduction) trust. Upon the death of the surviving spouse, the QTIP trust would be distributed in accordance with the terms of the family trust.
Article 4, Section 2 of the trust gave Bryn the option to purchase the operating assets of Byron J. Myers, Inc. ("the business") upon the death of the last to die of Byron and Rosilea. The family-owned business was a Missouri corporation, doing business as Economy Lumber and Hardware, that Byron had started and that Bryn had taken an active role in managing and operating. The trust provided that the "operating assets" of the business included all of the assets of the business, including goodwill, but excluding real property. The trust further provided that Bryn's option was to purchase the business's operating assets at their fair market value upon such terms, including cash or credit, as the trustee deemed appropriate. The trust allowed Bryn a one-year period after the death of the last to die of Byron and Rosilea to exercise this option.
Article 4, Section 3 of the trust provided when and how the family trust was to be distributed. This section stated:
Section 3. Distribution of Family Trust. Upon the death of the last to die of my spouse and me, my Trustee shall divide the Family Trust, after the exercise, if any, of the option set forth in Section 2 of the ARTICLE, into a sufficient number of equal shares so as to create one share for:
(a) My Living Children. Each of my children who is then living; and
(b) My Deceased Children. Each of my children who is then deceased but has one or more descendants then living.
Article 4, Section 5 detailed the distribution of a living child's share:
Section 5. Distribution of Living Child's Share. Each share created for a living child of mine under Section 3(a) of this ARTICLE shall immediately be distributed, free and clear of trust, to such child.
Byron died in June 2005, and Rosilea died in September 2012. On Rosilea's death, Bryn and James became joint successor trustees of the trust. James later resigned his position as co-trustee, leaving Bryn as the trust's sole trustee. After Rosilea's death, Bryn made distributions from the trust to Nancy, James, and herself in somewhat equal amounts.
Just over nine months after Rosilea died, James died intestate in June 2013, leaving his widow, Teena Simon, but no *106 children. Teena is the personal representative of James's estate. Bryn did not exercise her option to purchase the business's operating assets within one year after Rosilea's death in September 2012.
The total value of the assets from the trust when James died was between $3.1 and $3.4 million. After James's death, Bryn continued to make distributions from the trust to Nancy, James's estate or Teena, and herself, again in somewhat equal amounts, at various times in 2014 and 2015. Included in the distributions to Teena were regular monthly housing allowances ranging from $700 to $950.
In the summer of 2015, Teena was living in a house on the business's property that had been built for her and James. Bryn became angry with Teena because Teena had been living in the house without paying rent since James's death, and Bryn felt it was only fair that Teena pay either rent or the mortgage on the property. Bryn was also angry that her counsel had instructed her to pay to Teena James's entire one-third share of the trust, which included a distribution from a large investment holding in July 2015. Bryn asked Teena to move out of the house by August 2015, and Teena complied.
In March 2016, Bryn's counsel sent Teena's counsel a letter stating that James's estate was entitled to one-third of the common stock that the trust owned. Both Bryn and Teena said the letter was an offer to purchase James's one-third share of the stock. Teena rejected the offer.
After Teena rejected Bryn's offer to purchase James's share of the stock, Bryn decided to take a closer look at the language of the trust agreement. According to Bryn, issues had arisen between her and Teena that caused her to grow distant from and acquire a general dislike for Teena. When Bryn decided to reread the trust agreement in May 2016, she was specifically looking for a way not to have to pay Teena any more money.
After rereading the trust agreement, Bryn decided that the trust's language meant to exclude Teena from receiving any distributions from the trust because James died before Bryn's one-year option period within which to purchase the business's operating assets had ended and, therefore, before any distributions from the trust were supposed to have begun. On her counsel's direction, Bryn stopped making distributions from the trust altogether.
In September 2016, Teena filed a petition in the probate court seeking an order removing Bryn as trustee, imposing a constructive trust on the trust assets, requiring an accounting of the trust assets, requiring Bryn to reimburse the trust for money she allegedly had taken and retained for personal use, and declaring that James's estate was a proper beneficiary under the trust to receive a one-third interest in all of the trust's assets.
In response, Bryn filed an answer denying all of Teena's allegations. Bryn asserted, as an affirmative defense, that Teena lacked standing because the trust was to be divided among the children of Byron and Rosilea then living one year after the last to die of Byron and Rosilea and, because James died before that time, Teena did not have standing, either individually or as the personal representative of James's estate, to bring any action relating to the trust. Bryn also asserted, as an affirmative defense, that the trust contained a no-contest clause, so even if James's estate were a beneficiary, Teena forfeited the estate's interest by filing a lawsuit attacking the trust. Additionally, Bryn alleged counterclaims seeking orders declaring that only she and Nancy were trust beneficiaries and requiring Teena to pay back the over $730,000 that she receiv *107 ed from the trust under theories of money had and received or unjust enrichment. Nancy entered the case, admitted all of Bryn's counterclaim allegations, and consented to the court's granting the relief that Bryn requested. Teena then filed an answer denying the allegations in Bryn's counterclaims.
The parties agreed to bifurcate the issues and have the court first hear and decide Bryn's counterclaim for an order declaring that only she and Nancy were trust beneficiaries and Bryn's affirmative defense that Teena's lawsuit violated the trust's no-contest clause. Depending on the outcome of these issues, all other remaining issues would be heard at a later date, if necessary.
Trial was held in July 2017, and the court issued its judgment in November 2017. In its judgment, the court held that James's estate was a proper beneficiary under the language in the four corners of the trust. The court found that the plain meaning of the words in the trust acted to create a vested interest with right of future enjoyment in all of Byron and Rosilea's children who were living as of the death of the last to die of Byron and Rosilea, which in this case was September 2012.
The court rejected Bryn's contention that the children's interests did not vest until September 2013 on the expiration of Bryn's option to purchase. In so holding, the court found it significant that the purchase option was for only the business's operating assets; thus, the court concluded that only the business's operating assets were to be excluded from the trust's assets for a period of up to one year after Rosilea's death or until Bryn elected to exercise her option. The court found that this evidenced an intent by the trust settlor to provide for Bryn's purchase without limiting the vesting or distribution of any other beneficiary's interest in any remaining trust assets. The court further found that, because there was not express language requiring a beneficiary to live for one year following the last to die of Byron and Rosilea, the beneficiaries were deemed to have a vested interest at the earliest possible moment, which would have been on the death of Rosilea in September 2012.
Accordingly, the court concluded that Nancy, James, and Bryn all had a vested interest in the trust as of Rosilea's death, regardless of the date of enjoyment or distribution of the trust. Consequently, the court ruled that Teena, as the undisputed personal representative of James's estate and his sole heir, had standing as a beneficiary in this matter. The court also held that Teena's actions had not violated the trust's no-contest clause. After the court certified the judgment for immediate appeal pursuant to Rule 74.01(b), Bryn filed this appeal.
STANDARD OF REVIEW
Review of this court-tried probate case is governed by Murphy v. Carron , 536 S.W.2d 30 (Mo. banc 1976). Alexander v. UMB Bank, NA , 497 S.W.3d 323, 326 (Mo. App. 2016). Therefore, we will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Murphy , 536 S.W.2d at 32. We review questions of law, such as the meaning of a trust's provisions, de novo. Alexander , 497 S.W.3d at 326.
ANALYSIS
In her sole point on appeal, Bryn contends the circuit court erred in holding that James had vested beneficiary interest in the trust, which Teena then inherited as his heir. She argues that the trust's plain language expressly provides that, in order *108 to receive a share of the trust as one of Rosilea's living children, James had to survive until the expiration of Bryn's one-year option period within which to purchase the business's operating assets following Rosilea's death. Bryn asserts that, because James died within the one-year option period, he never acquired his beneficiary interest in the trust; therefore, his estate, and Teena, as his heir, had no beneficiary interest in the trust.
The paramount rule in construing a trust is to determine the settlor's intent. Blue Ridge Bank & Trust Co. v. McFall , 207 S.W.3d 149, 156 (Mo. App. 2006). We ascertain the settlor's intent from the "four corners" of the trust instrument, reading the trust instrument as a whole and not giving any particular clause "undue preference." Id. at 157. The settlor "is presumed to know and intend the legal effect of the language he [or she] uses." Id. Unless the context "indicates a different meaning of a word, the word will be interpreted according to its plain, ordinary meaning." Id.
Article 4, Section 3 of the trust created a remainder interest in favor of Byron and Rosilea's living children and the descendants of their deceased children. "A remainder interest is a 'future interest' that is 'created in a transferee.' " Alexander , 497 S.W.3d at 328 (quoting Restatement (Third) of Property § 25.2 (2011)). "[A] future interest is one which involves a postponement of the possession and enjoyment of the property." Id. (quoting L. Simes & A. Smith, The Law of Future Interests , § 575 (3d ed. 2002)).
Remainder interests are either vested or contingent. Id. We explained the difference between vested and contingent remainder interests in Alexander :
A "vested" remainder interest is not subject to any condition precedent other than the termination of the preceding estates. With vested remainders, the estate in remainder passes by the conveyance (that is, when the will or trust takes effect), but possession and enjoyment of the estate in remainder are postponed, though invariably fixed to remain to certain determinate persons. A "contingent" remainder interest is one where the right to possession or enjoyment is subject to a condition precedent other than the termination of prior interests. With contingent remainders, the estate in remainder is limited to take effect either to a dubious or uncertain person, or upon a dubious and uncertain event; so that the particular estate may be determined, and the remainder never take effect.
Id. (citations and internal quotation marks omitted). As we noted, however, " '[u]nder modern rules of property,' ... the distinction between vested and contingent remainder interests has been rendered largely irrelevant." Id. (quoting John Borron, 5 Mo. Prac., Probate Law & Prac., § 342 (3d ed. 1999)). This is because "[i]t is a generally accepted proposition that a remainder interest need not be vested to be descendible or subject to devise by intestacy." Id. Hence, regardless of whether a remainder interest is characterized as vested or contingent, "the general rule suggests that the interest is descendible through an estate or by intestacy." Id.
An exception to this rule is when the remainder interest is conditioned on the beneficiary's survival. Where the remainder interest, be it vested or contingent, is conditioned on survival, " 'the interest is completely lost if [a beneficiary] fails to survive until the preceding interests are terminated and the time has come for [the beneficiary] to possess and enjoy the property.' " Id. at 328-29 (quoting L. Simes & A. Smith, The Law of Future *109 Interests , § 575 (3d ed. 2002)). However, " 'a requirement of survival is never implied in the absence of specific language giving rise to the implication.' " Id. at 329 (quoting L. Simes & A. Smith, The Law of Future Interests , § 576 (3d ed. 2002)). "[T]he cases in which the courts imply a condition precedent of survivorship [of the future interest] are those in which the language as to the time of distribution actually expressed in the [trust], if taken literally, cannot be carried out unless the legatee or devisee survived." Id. (quoting L. Simes & A. Smith, The Law of Future Interests , § 576 (3d ed. 2002)).
The remainder interests in the subject trust do contain a requirement of survival, as Article 4, Section 3 provides that only children "then living" are entitled to a share, and only deceased children's descendants "then living" are entitled to a share:
Section 3. Distribution of Family Trust. Upon the death of the last to die of my spouse and me, my Trustee shall divide the Family Trust, after the exercise, if any, of the option set forth in Section 2 of the ARTICLE, into a sufficient number of equal shares so as to create one share for:
(a) My Living Children. Each of my children who is then living ; and
(b) My Deceased Children. Each of my children who is then deceased but has one or more descendants then living.
(Emphasis added.) As James died without children, subsection (b) is not applicable. The issue, then, is at what time James must have been "then living" in order to be entitled to a share of the family trust. Teena contends that James needed to be living only at the time of Rosilea's death, while Bryn argues that James had to survive until the expiration of the one-year option period following Rosilea's death.
In resolving this issue, we are guided by the general principles in interpreting wills and trusts that " '[t]he law favors vested estates, and the rule is that estates shall be held to vest at the earliest possible period, unless a contrary intention is clearly manifested in the grant.' " Hess v. Proffer , 87 S.W.3d 432, 436 (Mo. App. 2002) (quoting Tindall v. Tindall , 167 Mo. 218, 66 S.W. 1092, 1094 (1902) ). Furthermore, "a beneficiary's interest can vest prior to disbursement of the assets." Wilson v. Rhodes , 258 S.W.3d 873, 878 (Mo. App. 2008). Lastly, we are mindful that adverbs of time, such as "after" and "at," " 'in grants creating remainders are construed, absent a contrary intention, to relate to the commencement of the remainderman's enjoyment and possession of[,] and not the vesting of his title to[,] the property.' " McFall , 207 S.W.3d at 159-60 (quoting Tapley v. Dill , 358 Mo. 824, 217 S.W.2d 369, 373 (1949) ).
Applying these principles to the plain language of Article 4, Section 3, the earliest possible period for the children's interests to have vested was upon the death of Rosilea, as she was the last of their parents to die. At that time, the only interest in the trust that preceded the children's interests was terminated. The trust directed that, upon Rosilea's death, the trustee was to divide the family trust into a sufficient number of equal shares so as to create one share for each of Byron and Rosilea's children then living. The children then living when Rosilea died were Nancy, James, and Bryn. Thus, all three children's interests in the family trust vested upon Rosilea's death.
The clause, "after the exercise, if any, of the option set forth in Section 2 of the ARTICLE," pertained only to the enjoyment and possession of the specific trust property subject to the option. The specific trust property subject to the option was *110 the business's operating assets. Therefore, only the children's ability to enjoy and possess their share of the business's operating assets or their share of the remuneration that the family trust would receive if Bryn elected to purchase the business's operating assets was delayed until Bryn decided to exercise her option or the one-year option period expired, whichever occurred first.
Looking at the four corners of the trust, there was no clear, specific language manifesting the settlor's intent to delay vesting of the children's interests in the family trust until the expiration of the one-year option period following Rosilea's death. Likewise, there was no clear, specific language manifesting the settlor's intent to delay distribution until after the expiration of Bryn's one-year option period. Under Article 4, Section 5, each share created for a living child was to be immediately distributed, free and clear of the trust, to such child. Each child's share of the family trust's existing assets, except for the business's operating assets, could be immediately distributed upon Rosilea's death. Nothing in Article 4, Section 5's language indicated that, because the business's operating assets or the remuneration that the family trust might receive if Bryn exercised her option to purchase the business's operating assets could not be distributed immediately upon Rosilea's death, the distribution of all of the family trust's assets was to be delayed until the expiration of the one-year option period.
We hold that, because James was alive when Rosilea died, he had a vested interest in the family trust as one of her living children and was entitled to immediate distribution of his share at that time. Therefore, the circuit court did not err in finding that Teena, as the personal representative of James's estate and his sole heir, had standing as a beneficiary under the family trust.
CONCLUSION
The judgment is affirmed.
All Concur.

Because most of the people involved in this case share the last name Myers, we will refer to everyone by their first names. No familiarity or disrespect is intended.

The record indicates that they each executed first trust agreements in 1984, a restatement of the trust agreements in 1991, and a second (and final) restatement of the trust agreements in 2002. As the terms of the trusts were essentially identical, we will refer to them as "the trust."